BALDWIN *v.* NEAL.

4-3787

Opinion delivered March 25, 1935.

*Thos. B. Pryor* and *W. L. Curtis,* for appellants.

*Partain & Agee,* for appellees.

BAKER, J. In this cause the plaintiffs filed their suit in the Crawford Circuit Court on the 7th day of June, 1934, alleging ownership of the E½ of NW¼ and W½ of NE¼, section 7, township 9 north, range 30 west, Crawford County, Arkansas.

It is also alleged that on the 14th of May, 1933, the defendants, L. W. Baldwin and Guy A. Thompson, trustees in bankruptcy, for the Missouri Pacific Railroad Company, a bankrupt, operated the railway along and through the lands belonging to the plaintiffs, and that on said line of railway there was a railroad dump and trestles, and that prior to said date the line of said railway had been so carelessly and negligently built and maintained that there were insufficient openings and culverts under the tracks and across their right-of-way and under the dump of said railroad and tracks, north of the above described lands, to carry and permit the escape of water coming through Clear Creek and the valley adjacent thereto, and that said openings, formerly under the said railway, had been carelessly and negligently closed up

and filled up, so as to form obstructions in waterways and outlets, leaving small, but inadequate passageways to permit the escape of water that might accumulate in said valley north of, or on the upper side of the said railroad, and that said railway and dump were such as to interfere with the natural drainage and water courses of the said Clear Creek, and the valley in which it is located, to such an extent that on the 14th day of May, 1933, a heavy rain having fallen in the valley in which Clear Creek runs, the water was impounded, on the north side of the said railroad track, and, being unable to escape or pass through the openings left by the railroad company, in said railroad dump, backed up over lands north of and adjacent to the railroad and finally broke through the railroad embankment or dump and from that point ran out over the fields and lands of the plaintiffs, destroying crops growing thereon, washing away and destroying the soil of said lands, and also that it washed and carried upon the said lands great quantities of rocks, gravel and other debris, to such an extent as to destroy the usefulness of said lands as farm property.

The complaint also alleged that on the 1st day of April, 1933, L. W. Baldwin and Guy A. Thompson were, by the United States District Court for the Eastern District of Missouri, duly appointed as trustees in bankruptcy for the said railroad and that they were the duly constituted, qualified and acting trustees of the corporation during all of the times mentioned in the complaint.

The trustees filed what they designated as a demurrer to the said complaint, pleading facts in the so-called demurrer, but challenging the rights of plaintiffs to sue these trustees in bankruptcy without having first procured permission from the court appointing them, and pleading also that the complaint showed upon its face that, if the plaintiffs had been damaged, as alleged in the complaint, their cause of action was against the railroad company and not against the trustees. The defendants prayed for dismissal of the suit. The demurrer being overruled, defendants filed their answer, wherein they denied all of the substantial allegations of the complaint, but pleaded no affirmative defense.

Upon the trial of this cause the judgment was had for plaintiffs, and it is from this judgment that this appeal has been taken.

There is a considerable volume of testimony in this record, but the questions raised for our consideration are such that it will be necessary to state very little of the said testimony in a determination of the issues presented.

Some essential facts necessary to be stated are to the effect that the railroad dump interfered with the natural water course, which was formerly on the east side of the farm next to the hill. The direction of the natural drainage was southeast. If the water had been permitted to go according to the natural drainage, and without having been retarded or impeded by the railroad dump, it would have spread out and would have gone over the land, but without the force and volume that followed the breaking of the embankment. The natural opening or passageway for the water had been closed since about 1923. This was an opening about 90 feet long under the railroad tracks. When it was closed at that time, there was left of the opening a concrete box or space about four by five feet, through which the accumulated water should pass.

Witnesses testified, who had observed the high water of 1888 and 1895, and 1927, and perhaps on other occasions. It was a disputed question of fact as to whether the water in 1933 was higher than on the former occasions of high water.

It was urged also by the appellants that the embankment for the highway, built north of the railroad, changed conditions from what they were many years ago, and that this brought about some new factors which helped to cause the damage sued for in this case. We think it is unnecessary, however, to set forth any substantial part of this testimony, either as to the location of the highway, or the necessity for passageways under it to permit the outflow of water, or to argue the possible effects of the highway, for the reason that a substantial number of witnesses testified that in places the water was several feet deep over the highway. Therefore without regard to its method of construction or the pas-

sageways under it, we are unable, by any analysis of the testimony before us to determine in what manner the location of the highway, or the method in which it was constructed, affected the conditions as they existed at the points upon the railroad embankment, where the break occurred, resulting in the damage.

It was not the duty of the railroad company to build an embankment that would hold fast the floodwaters and prevent them from flowing over these lands, but since its embankment had been built so as to impede or retard the flow of water, in the event of excessive rainfall, it was the duty of the railroad company to provide such passageways as would permit the outflow of water, thereby preventing surrounding lands from being overflowed to any greater degree or extent than they were prior to the building or filling in of the embankment.

At the time the railroad company closed the ninety-foot passageway under its track, by filling in with rock and dirt, it was its duty to leave such passageways as to allow for the flow of floodwaters usually, or occasionally passing through this valley, and it was evidently the intention of the railroad company, in so filling the said passageway under the trestle, that this fill should be a permanent one, and the opening left therein, four by five feet, was intended as the outlet for water that might accumulate at that point.

Had the railroad company failed in this duty and built its embankment without openings or passageways for water at this point, the injury would have been original, at least, in so far as damage might have followed from back-waters.

The law applicable to this case is clearly stated in the case of *St. L. I. M. & S. R. Co.* v. *Biggs*, 52 Ark. 240, 244, 12 S. W. 331. We there said: "Whenever the nuisance is of a permanent character and its construction and continuance are necessarily an injury, the damage is original, and may be at once fully compensated. In such case the statute of limitations begins to run upon the construction of the nuisance. But when such structure is permanent in its character, and its construction and continuance are not necessarily injurious, but may

or may not be so, the injury to be compensated in a suit is only the damage which has happened; and there may be as many successive recoveries as there are successive injuries. In such case the statute of limitations begins to run from the happening of the injury complained of.'' Supporting this principle are citations of authority unnecessary to repeat here.

We recently had occasion to review this phase of the law in the case of *Daniels* v. *Batesville,* 189 Ark. 1127, 76 S. W. (2d) 309, delivered December 3, 1934, in which we quoted, with approval, the foregoing paragraph from the Biggs case, *supra.*

It will be observed from examination of the foregoing pleadings that the plaintiffs filed this suit upon the theory set out in the Biggs case,—that, although the structure made by the railroad company in filling in or closing up the trestle under the railroad track was permanent in character, yet it was not at that time necessarily injurious; that it might, or might not, at some time become so. The defendants, or appellants here, joined issue upon that one proposition and did not then, or does not yet, attempt to say that the damage was original, except as they inferentially argue by the demurrer and by cases cited.

Appellants have not by any affirmative plea availed themselves of the contention that the injury was original, beginning at the time of the filling in of the passageway. The issues have been joined upon the one theory,—that where the nuisance is one permanent in its character, but which may or may not cause injury, dependent upon conditions that may occur or happen after the construction of the nuisance. In such cases the law is well settled that there may be as many successive recoveries as there are recurring injuries resulting from the faulty construction however permanent in form it may have been.

The above and foregoing statements of the law, applicable in cases of this kind, is the answer to the questions raised by the appellants, not only in the demurrer, but also by several of their instructions, that is, that the damage resulting was caused by the railroad company

prior to the time that the trustees sued herein took charge of the said company and began to operate it.

The cause of action did not exist until the injury occurred, though the faulty construction was a constant or potential threat or menace, which might or might not result in injury at some time, dependent, of course, upon conditions such as might prevail at any time after the completed structure had been built.

The trustees took the road in the condition in which they found it and prior to the time of the resulting damage. They took it with this potential liability in existence, a condition which might result in injury, or which might continue indefinitely without any cause of action accruing, but such that they might become liable for as a part of their expense of administration of the property. This must necessarily be true. They took the property without liability on this account, but liability followed the injury, and this was part of the obligations assumed by them at the instant they took charge.

It must necessarily follow from the foregoing that the court was correct in overruling the demurrer and also that the court was correct in refusing to consider this same proposition in the several instructions offered by the appellants seeking to differentiate the liability of the railroad, which had never accrued, from that of the trustees, when their liability did accrue.

Although we are not favored in this case with any judgment or recital of powers of the trustees of the railroad company, we understand such trustees are more than mere naked custodians of the property. They operate the railway system in order to preserve it, much as receivers would.

Therefore no special authority to sue was necessary. General authority exists under the law. Title 28, USCA, p. 212, § 125. Since the foregoing disposes of the vital matters on this appeal, it would unduly extend this discussion to treat all alleged errors separately. We have duly considered them, and find no error.

Affirmed.